145 So.2d 509 (1962)
Alfonso Ray LOPEZ, Willard D. Miller, East Coast Land Company, Ruskin-Manatee Realty Corp., and F & M Sales Corporation, Appellants,
v.
Duval M. SMITH and May P. Smith, His Wife; Thomas Powell Whitaker and Robert Dallas Whitaker, As Executors of the Last Will and Testament of Tom Whitaker, Deceased; David M. Schwartz and Scenic Isles, Inc., Appellees.
No. 1971.
District Court of Appeal of Florida. Second District.
September 21, 1962.
Rehearing Denied October 22, 1962.
*510 Paul Game and Charles H. Ross, Tampa, for appellants.
Hall, Hartwell & Douglass, Tallahassee, and Corcoran & Henson, Tampa, for appellees.
*511 KANNER, Judge.
Ownership of certain island property lying in the Little Manatee River in Hillsborough County, Florida, comprises the subject of the present dispute. Plaintiffs-appellants, through the suit below, sought to quiet title to the islands or parts of islands involved, asserting that they are contained within the boundaries of three fractional government lots in Section 12, Township 32 South, Range 18 East. The appeal is from a final decree of the chancellor dismissing the complaint and his subsequent order denying petition for rehearing.
Appellant Lopez claims to own a part of Lot 6, appellant Miller a part of Lot 2, and the three corporate appellants, East Coast Land Company, Ruskin-Manatee Realty Corporation, and F & M Sales Corporation, a portion of Lot 5. Appellants, stating that certain island property falls within their boundaries, claim under Patent No. 4, issued in the year 1856 by the United States Government to the State of Florida under the Swamp and Overflowed Lands Act of Congress of September, 1850. By that patent, all the government lots in Section 12 were conveyed, totalling an estimated 470.61 acres. Three of these lots were acquired by appellants' predecessors in title around 1883 from the Trustees of the Internal Improvement Fund of Florida.
Defendants-appellees, Duval M. Smith and May Smith, his wife, the estate of Tom Whitaker, deceased, David Schwartz, and Scenic Isles, Inc., claim ownership of the islands in the Little Manatee River by virtue of their deraignment of title originating in Patent No. 33 issued in 1884 by the United States Government to the State of Florida under the Swamp and Overflowed Lands Act, 9 Stat. 519. Included in the lands conveyed by this patent were an estimated 300 acres of land described as "The unsurveyed part of Township 32 South, Range 18 East." In June, 1896, the Trustees of the Internal Improvement Fund issued to one C.C. Dischong Deed No. 15,199 conveying "The unsurveyed part of Township 32 South, Range 18 East, except unsurveyed part of Section 10, and the unsurveyed Island #1 in E 1/2 of E 1/2 of Section 20." Dischong is a predecessor in title of appellees.
The factual source material of this dispute goes back for more than a century, or to the year 1846, when a government survey of Township 32 South, Range 18 East was completed, with field notes and plat of survey being filed and approved by the government. Three copies of this plat of survey are among the exhibits filed in the cause. These are as they appear, respectively, in the public records of Hillsborough County, in the records of the Department of the Interior, and in the records of the Commissioner of Agriculture of the State of Florida.
These exhibits show Section 12 of the township to be traversed by the Little Manatee River, which enters the section on the east as one stream, branches off into three streams, then leaves the western boundary in two streams flowing from east to west. Islands are indicated by the plats of survey to lie within and between the branches of the river. The lands lying north of the waters of the Little Manatee River in Section 12 are divided into four lots numbered from east to west as Lots 1, 2, 3, and 4, while the lands lying south of the river are divided into four lots numbered from west to east as Lots 5, 6, 7, and 8. When the original survey was made, the boundaries of the section were surveyed and two traverse lines were run through it east and west. Instructions to the government deputy surveyors required:
"You will accurately meander, by course and distance, all navigable rivers which may bound or pass through your district; all navigable bayous flowing from one or into such rivers; all lakes or deep ponds of sufficient magnitude; and all islands suitable for cultivation."
The islands in the Little Manatee River were not meandered or surveyed.
*512 The cause was originally before this court on appeal from dismissal of the complaint by one of the circuit judges of Hillsborough County, now deceased, and was reversed and remanded, as reported in Lopez v. Smith, Fla.App. 1959, 109 So.2d 176, 178. In our opinion remanding the cause, this court stated:
"The problem which emerges from the allegations of the complaint is location of the boundary lines for government lots two, five, and six in section 12. Within this problem are two basic controlling questions, first, whether the meander lines, or whether the ordinary high water marks delineate the boundaries, and, second, whether all of the branches of the Little Manatee River are navigable. If the main banks or the meander lines of the Little Manatee River, as described above, comprise the boundaries of appellants' lots two, five, and six, then the islands or parts of islands in question would fall within these lots. If, instead, as the trial court held, the ordinary high water mark of that body of water is the boundary line and the north and south branches are navigable, then the islands or parts of islands would not be encompassed within the boundaries of appellants' lots."
The problem as framed by the chancellor who heard the cause on remand read:
"(1) Does the south traverse line of Section 12 constitute the northern boundary of Lots 5, 6, 7, and 8, and the north traverse line of said section constitute the southern boundary line of Lots 1, 2, 3 and 4, or
"(2) Does the highwater mark of the waters of the main branch of the Little Manatee River constitute the northern boundary of Lots 5, 6, 7, and 8, and the southern boundary of Lots 1, 2, 3, and 4 or
"(3) Is the north branch of the Little Manatee River navigable and the ordinary highwater mark on the north bank thereof the south boundary of Lots 1, 2, 3 and 4, and
"(4) Is the south branch of the Little Manatee River navigable and the ordinary highwater mark on the south bank thereof the north boundary of Lots 5, 6, 7 and 8?"
In the opinion portion of his decree, the chancellor made a comprehensive analysis of the issues, with specific findings of fact and of law. Holding that the Little Manatee River and its pertinent branches are navigable in fact and in law,[1] the chancellor then concluded by finding "* * * that the patent from the United States to the State of Florida and deeds from the State of Florida to the defendants' predecessors in title conveyed good title to all lands lying between the meandered banks of the Little Manatee River in Section 12." He further made findings[2] to the effect that the boundaries of the government lots involved do not extend to include the contested island properties.
*513 Arguments of appellants may be grouped generally under two main classifications, one of which relates to boundaries and the other of which deals with the question of title. Considering first the matter of boundaries, we find it essential to examine the law applicable to navigability as this element affects boundaries.
Through the landmark case of Broward v. Mabry, 1909, 58 Fla. 398, 50 So. 826, it is pointed out that whether a stream is navigable for useful public purposes is to be ascertained by applying existing provisions and principles of law to the particular facts of individual cases. The court in that case held Lake Jackson in Leon County navigable, although at times portions of the bed were so dry that crops might be planted and grown and although the principal uses to which the waters of the lake were put were for the grazing of cattle, for fishing, and for fowling. The opinion stated:
"Where a stream or body of water is permanent in character, and in its ordinary natural state is in fact navigable for useful purposes, and is of sufficient size and so situated and conditioned that it may be used for purposes common to the public in the locality where it is located, such water may be regarded as being of a public character, and the title to the land thereunder, including the shore or space between ordinary high and low water marks, when not included in the valid terms of a grant or conveyance to private ownership, is held by the state in its sovereign capacity in trust for the lawful uses of all the people of the state in the water and the land, subject to lawful governmental regulation of such uses. Capacity for navigation, not usage for that purpose, determines the navigable character of waters with reference to the ownership and uses of the land covered by the water. Grants and conveyances of land bordering on navigable waters carry title in general to ordinary high-water mark when a valid contrary intent does not appear."
These principles were affirmed in the case of Clement v. Watson, 1912, 63 Fla. 109, 58 So. 25. Whether or not waters may be considered as navigable was stated there to depend upon the size, depth, and other conditions that would make waters in fact capable of navigation for useful public purposes. Navigability was amplified in the case of Martin v. Busch, 1927, 93 Fla. 535, 112 So. 274, wherein it was said:
"The navigable waters include lakes, rivers, bays, or harbors, and all waters capable of practical navigation for useful purposes, whether affected by tides or not, and whether the water is navigable or not in all its parts towards the outside lines or elsewhere, or whether the waters are navigable during the entire year or not."
Thus capacity for navigation, not usage for that purpose, determines the navigable character of waters with reference to the ownership and uses of the land covered by the water.
In Baker v. State, Fla. 1956, 87 So.2d 497, The Florida Supreme Court observed:
"In State of Oklahoma v. State of Texas, 258 U.S. 574, 42 S.Ct. 406, 411, 66 L.Ed. 771, 776, the Supreme Court held the settled rule in this country to be `that navigability in fact is the test of navigability in law, and that whether a river is navigable in fact is to be determined by inquiring whether it is used, or is susceptible of being used, *514 in its natural and ordinary condition as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.'"
The court continued that it had approved a similar test of navigability in Broward v. Mabry and Clement v. Watson.
In the case of McDowell v. Trustees of Internal Improvement Fund, Fla. 1956, 90 So.2d 715, capacity for navigation was at least partially determined on the basis that the lake was useful for fishing. It is noted that the United States Supreme Court has commented that a lack of commercial traffic is not a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation. See United States v. Appalachian Electric Power Co., 1940, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243.
The use of evidence concerning actual navigation of a body of water subsequent to the time of admission to the Union of the state in which such water is located has been deemed admissible for the purpose of determining the susceptibility of the water for use as a highway of commerce at the time the state was admitted to the Union. See United States v. Utah, 1930, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844. See also 56 Am.Jur., Waters, section 193, page 657; 65 C.J.S. Navigable Waters § 9, page 60. The case of State, by Burnquist v. Bollenbach, 1954, 241 Minn. 103, 63 N.W.2d 278, indicated that the state court could consider evidence of present use and capacity for purpose of navigation as bearing on whether a body of water was navigable within the Federal test in 1858 when the State of Minnesota entered the Union.
Appellants argue that there was no evidence to show navigability of the north and south branches of the Little Manatee River at the time of statehood or of the original survey. They believe that the south branch was formerly but a salt marsh or slough or bayou lying south of a claimed peninsula, that a hurricane in 1848 caused the breaking through of two passes between parts of the peninsula, that the major portion of the area south of the peninsula, between it and the high bank of the river valley, constitutes what is now known as the south branch, and that the rise in level of the Gulf of Mexico has caused the salt marsh to become deeper. As to the geological history relating to the waters and lands in the section at that time, appellants state that the testimony of Dr. Robert O. Vernon, geologist for the State of Florida, witness for appellees, that peninsulas appearing upriver are "a geological repetition of what is occurring" today, supports their belief that Goat and Cactus Islands were once parts of a peninsula attached to the mainland. Appellees, on the other hand, point to testimony of Dr. Vernon that the waters and lands of Section 12 have changed but little since the time of the original survey.
It may be noted that Dr. Vernon's testimony indicates that the lands, islands, and waters in Section 12 have changed but little for a great many years and that since the original survey the only significant change has been a gradual adjustment of the river to the slowly rising sea level. Such criteria as the difference in the soil layers on the islands compared with the mainland, difference in elevations of the islands and the curving lines of the channels separating them were analyzed. His belief was that the islands were formed, shaped, and born of the gradual shifting of the river channel adjusting to the rising sea level and not through severance from the mainland by the force of the hurricane. Such a severance, he stated, would have cut through in straight lines and not in the gently curving contours of the channels flowing between the islands. During direct examination he stated:
"There has been very little change over the past few hundred years in the river valley, and what change there *515 has been has been the result of very slow accretion and erosion of the valley wall."
The following exchange took place during cross-examination by counsel for appellants:
"Q. All right. Did I understand you to testify that in 1843  well, let's say 1845, which is the time the State became a state  that this area was very much as it is today?
"A. Yes, sir."
Without delineating the evidence bearing upon the question, this court is in accord with the finding of the chancellor that the Little Manatee River in all its streams and branches in Section 12 is a navigable body of water and that each of these branches, the north branch, the central or main branch, and the south branch, is navigable in fact and in law. The expert testimony of the state geologist heretofore quoted indicates that the waters of the river then were essentially as they are today. Although appellants as plaintiffs averred non-navigability in their complaint, the Little Manatee River was meandered as navigable, and the waters are navigable today. We conclude that this status of navigability was applicable at the time of statehood, or of the original survey.
In considering boundaries of appellants' government lots, we must approach this subject from the perspective of our holding that the Little Manatee River in all its branches and streams is and was a navigable body of water. Before dealing with this matter specifically, it is well to view certain significant principles of law relating to boundaries.
A meander line generally is not a boundary, but it only marks the general contour of a shore; its purpose is to define the sinuosities of the stream and to aid in ascertaining the quantity of land to be disposed of. In the absence of exceptions or reservations, patents and other conveyances of lands shown to border upon a navigable stream or body of water carry title to the ordinary high water mark and include the unmeasured strip which usually exists between the water's edge and the meander line. Patton on Titles, Second Edition, Vol. 1, section 117, page 297; Clark on Surveying and Boundaries, Second Edition, section 201, page 209; 73 C.J.S. Public Lands § 32b., page 682; 11 C.J.S. Boundaries § 30b., page 573; 26 Fla.Jur., Public Lands, section 43, page 54; Martin v. Busch, supra; Lord v. Curry, 1916, 71 Fla. 68, 71 So. 21; Brickell v. Trammell, 1919, 77 Fla. 544, 82 So. 221; Apalachicola Land and Development Co. v. McRae, 1923, 86 Fla. 393, 98 So. 505; Tilden v. Smith, 1927, 94 Fla. 502, 113 So. 708; McDowell v. Trustees of Internal Improvement Fund, Fla. 1956, 90 So.2d 715; Lopez v. Smith, supra. Thus, the Florida jurisdiction has adhered to the general rule that grants and conveyances of lands bounded by navigable waters carry title to the ordinary high water mark of those waters, making such high water mark the boundary and not the meander line.
However, a meander line may constitute a boundary where so intended or where the discrepancies between the meander line and the ordinary high water line leave an excess of unsurveyed land so great as to clearly and palpably indicate fraud or mistake. 11 C.J.S. Boundaries, § 30b., page 574; 73 C.J.S. Public Lands § 32 b., page 682; 8 Am.Jur., Boundaries, section 31, page 767; Thompson on Real Property, volume 6, 1962 Replacement, section 3075, page 714; Clark on Surveying and Boundaries, Second Edition, section 210, page 215, section 308, page 366; and see Martin v. Busch, supra; Lord v. Curry, supra; Lopez v. Smith, supra.
One argument of appellants as to boundaries is that "Land lying within the surveyed traverse line of a government lot is a part of such lot even if it is separated by a minor stream from part of such lot on the mainland." Stating that the surveyed *516 traverse lines run according to the field notes do not follow the shore lines of the north and south branches, which they refer to as minor streams, they cite, among other cases, United States v. Lane, 1923, 260 U.S. 662, 43 S.Ct. 236, 67 L.Ed. 448, for the proposition that lands lying within the traverse lines should not be excluded from the property of the grantees who purchased the fractional government lots. In the Lane case certain claimed excessive acreage was vested by the court in the defendant lot owners. That case, involving swamp and overflowed lands, differs factually from the one at bar in that the dispute was between the government claiming under a resurvey and the patentees claiming under the original government survey. The government challenged the accuracy of the meander line of Ferry Lake, Louisiana, as being so grossly erroneous as to leave between it and the shore of the lake upon which the government lots bordered an excess of unsurveyed land. The court, in rejecting the argument that under the factual situation the meander line was the proper limit of the lots, commented that nothing in the circumstances suggested the conclusion that any fraud was committed or palpable mistake made by the original surveyor. The lot owners there were resisting an attempt to change the boundary as it was shown by the natural monument on the plat, or the shore of Lake Ferry. The United States Supreme Court sustained the efficacy of that natural monument. Acreage, while considered, was held not a controlling element.
In the instant case, the chancellor through his decree also declared the superiority of the natural monuments represented by the north and south channels of the Little Manatee River as against the traverse lines run pursuant to the survey of 1846.
The Lane case cited and quoted from an earlier United States Supreme Court decision, Mitchell v. Smale, 1891, 140 U.S. 406, 11 S.Ct. 819, 35 L.Ed. 442, wherein the court in discussing the nature and effect of a meander line run along a lake or shore, stated:
"The official plat made from such survey does not show the meander line, but shows the general form of the lake deduced therefrom, and the surrounding fractional lots adjoining and bordering on the same. The patents when issued refer to this plat for identification of the lots conveyed, and are equivalent to and have the legal effect of a declaration that they extend to and are bounded by the lake or stream. Such lake or stream itself, as a natural object or monument, is virtually and truly one of the calls of the description or boundary of the premises conveyed; and all the legal consequences of such a boundary, in the matter of riparian rights and title to land under water, regularly follow."
An illustration of these principles as applied in the Florida jurisdiction may be found in the case of South Florida Farms Co. v. Goodno, 1922, 84 Fla. 532, 94 So. 672, which cited the Mitchell and Lane cases, among others. The court commented:
"A section of land, as a legal subdivision under the congressional rules of survey, is a mile square, and usually contains 640 acres. When a section is not whole or regular in its contents  that is, where it does not contain approximately 640 acres  it may properly be called a `fractional section.' Where, because of the presence of a permanent body of water which is approximately meandered in making the survey, there is a deficiency in the area of a section, it is referred to as a `fractional section.' In such cases the water lines, and not the meander lines, may control as boundaries, even though there may be some land between the meander line and the water line. See Railroad Co. v. Schurmeir, 7 Wall. 272, 19 L.Ed. 74; Producers' Oil Co. v. Hanzen, 238 U.S. 325, 35 Sup.Ct. 755, 59 L.Ed. 1330; *517 Greene v. United States [5 Cir.] 274 Fed. 145; Lane v. United States [5 Cir.] 274 Fed. 290; Mitchell v. Smale, 140 U.S. 406, 11 Sup.Ct. 819, 840, 35 L.Ed. 442; 9 C.J. 190."
The chancellor, after considering all the evidence presented, including the field notes and the official plats of survey, concluded from these that "* * * the intent and purpose of the surveyor was, and that he did approximately traverse the south branch of the river and intended the waters of said south branch to be the north boundary of Lots 5, 6, 7, and 8" and that "* * * the north traverse line was run with every intent and purpose to make the northernmost waters of the Little Manatee the southern boundary line of Lots 1, 2, 3, and 4." The meander line does not usually act as a boundary in contravention of the superior quality of a natural monument, and here the chancellor was not required to apply it as a minimum boundary in derogation of the ordinary high water marks of the north and south branches of the river.
The next phase of appellants' argument as to boundaries sets out that "The main branch of the Little Manatee River is the boundary of the government lots although the meander lines run by the government surveyor do not exactly coincide with the high water mark of such main branch."
A navigable body of water, as related, normally is considered the boundary of fractional lots such as those owned by appellants. Since we have affirmed the finding by the chancellor that the north and south channels of the river are navigable, we must in this light consider the arguments of appellants that their fractional lots do not border those navigable channels but rather extend on across islands to the main channel of the Little Manatee River.
Appellants admit that the official plats of survey appear to show three branches of the river in the central and eastern portion of Section 12. They say, however, that this resulted from the arbitrary filling in by the map maker in the office of the Surveyor General of the space between the traverse lines on the north and south sides of the river with imaginary shapes unrelated to the actual land masses. They state that, by the field notes, the surveyor in traversing Section 12, 1st portion south branch Little Manatee, came to a creek three chains wide, crossed it, and then stood on a peninsula composed of what is now Goat and Cactus Islands, together with a segment of peninsula in government lot 8. They claim that this brought the surveyor to the north side of the south branch onto that peninsula and conclude that he abandoned his traverse of the stream which he had been referring to as the south branch and cut across land until he reached the main branch. The effect of the action of the surveyor as described by them is urged to be that the land between the meander line and the main branch of the river was thus unsurveyed and since not excessive became a part of the government lots.
The chancellor, finding that there is "nothing on the plat of survey that the Court can observe that in any way indicates that any part or portion of the government lots on the north side of the Little Manatee River lie south of the north branch of said river, nor that any part or portion of the lots on the south side of said river lie north of the south branch of said river," then found the field notes of the original survey to be in accord with the plat. In case of conflict between the plat and the field notes, however, by the weight of authority, the plat will control. Patton on Titles, Second Edition, section 312; 9 C.J.S. Boundaries § 143, page 221; 11 C.J.S. Boundaries § 52; and see Delaware Securities Corporation v. Kahn, 1937, 129 Fla. 26, 175 So. 779. From our independent study of the field notes along with the other evidence, we find them to be reasonably consistent when compared with the plat of survey and conclude that appellants' arguments that the main branch is *518 their boundary must be rejected. Although there are obvious discrepancies in the traverse lines as run by the surveyor with reference to the actual shore lines, these, under the circumstances, will not vary the boundaries of appellants' government lots as upheld by the chancellor. We have also considered the question of avulsion as it concerns boundaries, and, in the light of the evidence, we find that theory unsustainable.
Appellants additionally assert that "Discrepancies in amount of acreage resulting from different interpretations of information concerning boundaries of government lots can be an important factor in locating the true boundaries." While it is true that a disparity in quantity of land is a factor to be weighed, the Supreme Court of the United States, in the case of Cragin v. Powell, 1888, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566, gave expression to a principle which it characterized as well settled, saying:
"* * * when lands are granted according to an official plat of the survey of such lands, the plat itself, with all its notes, lines, descriptions, and land-marks, becomes as much a part of the grant or deed by which they are conveyed, and controls, so far as limits are concerned, as if such descriptive features were written out upon the face of the deed or the grant itself."
If, therefore, the official plat of survey with its accompanying corollary documents supplies data, including landmarks, by which the limits of a fractional section may be ascertained, a discrepancy in the number of acres conveyed will not usually permit the delineated boundaries to be altered, without a clear showing of fraud or palpable mistake.
In the case of Ewell v. Weagley, 4th Cir., 1926, 13 F.2d 712, the court cited and applied several cases considering the element of quantity, all of which were in accord with the principle that before resort can be had to quantity, the other elements of description must lose their superior value through ambiguities and uncertainties. An excerpt from the case of Powell v. Clark, 1809, 5 Mass. 355, 4 Am. Dec. 67, an early decision from the Massachusetts jurisdiction, was quoted. That case, said the Circuit Court of Appeal, states clearly and succinctly the rule and the reasons for it. The quoted portion of the Powell case included the statement that the words expressing the quantity of land do not amount to a covenant but are merely descriptive of the lands conveyed. The purchaser, the court pointed out, by taking the proper measure, that of having a survey made, could easily ascertain the contents of the lands being bought prior to conclusion of the purchase. If the purchaser chose to rely on the estimation of the seller, an express covenant could have been introduced into the deed. If the boundaries of the tracts had contained more than the quantity expressed, said the Massachusetts court, all would have passed with the deed; and if less was contained, the purchaser would then have title only to what in fact was included. The excerpt referred to contained the following statement:
"* * * In a conveyance of land by deed, in which the land is certainly bounded, it is very immaterial whether any or what quantity is expressed; for the description by the boundaries is conclusive."
It is interesting in this connection to note that the Supreme Court of Florida, in the case of Martin v. Busch, supra, involving submerged lands, said:
"* * * A conveyance of all of an unsurveyed fractional township or section of swamp and overflowed lands which borders on a navigable lake or other body of navigable water, carries title to the true line of ordinary highwater mark that has been or that should thereafter be legally established; *519 and, if the acreage stated in the conveyance of swamp and overflowed lands is less than the true acreage outside of the true line of ordinary high-water mark of the adjacent navigable water, such deficit does not authorize an extension or contraction of the true water line or give the grantee any sovereignty land within or on the lower or lake side of the true water line. The grantee takes with notice that the conveyance of swamp and overflowed land does not in law cover any sovereignty lands, and that the trustees of the swamp and overflowed lands as such have no authority to convey sovereignty lands."
The Supreme Court of Florida, in Altman v. Simon, 1933, 109 Fla. 196, 147 So. 222, an ejectment case, quoted from the earlier Florida case of Stonewall Phosphate Co. v. Peyton, 1897, 39 Fla. 726, 23 So. 440, as follows:
"`When a line was actually run and a division made in an original survey of land by the United States government, and the line or division was marked by corners or natural objects, and such survey be established in accordance with the United States field notes, the grantee in a patent from the government will take according to such actual survey, notwithstanding any mistaken description as to courses and distances, or the quantity of land stated to be conveyed.'"
Although quantity is an element carefully to be weighed when the superior criteria have failed, the chancellor in his judgment, as trier of the facts, found that the other elements involved in determination of boundaries had not been shown to have lost their preferential status. We do not think that, under the situation here, considerations of quantity compelled him to substitute that element for those to which the authorities have accorded priority.
We proceed now with the consideration of appellants' position as to title. They first assert that "After the State of Florida conveyed the title to lands described in the complaint to predecessors in title of appellants, the state could not convey the title thereto to predecessors in title of appellees." Delineating their deraignment of title and the number of acres involved in each conveyance of the government lots or parts of lots, appellants contend in summation that "* * * thereafter the State of Florida had title to no land within the exterior surveyed boundaries of Section 12 except sovereignty land and therefore could not convey any more land in that section to predecessors in title of appellees, or to anyone else."
It may be noted that this argument raises again the question of acreage to support appellants' claim. It also interposes the issue of sovereignty rights as being preclusive of appellees' claim, concerning which we shall comment later in this opinion.
Since the natural monuments represented by the waters of the south branch and the northernmost waters of the Little Manatee River comprise the boundaries recognized by the chancellor, his findings on this subject in the light of the instruments of conveyance and the other evidence amount to a judicial declaration that appellants had never been conveyed the contested property.
It is true that the courts will with great reluctance allow a claimant pursuant to a subsequent resurvey to disturb rights acquired in lands by a grantee deraigning title from patents issued under the original survey. See United States v. State Investment Co., 1924, 264 U.S. 206, 44 S.Ct. 289, 68 L.Ed. 639; Kelsey v. Lake Childs Co., 1927, 93 Fla. 743, 112 So. 887; Lake Childs Co. v. Kelsey, 1931, 103 Fla. 590, 137 So. 690; Cf. Title 43, Public Lands, section 772, U.S.C.A., page 85. However, who acquired what rights under the original survey is precisely the question before this court. We are here concerned, not with a claimant seeking to overturn rights *520 acquired under an original survey on the strength of a later resurvey, but with the necessity to review a judicial determination relating to the boundaries of lands as reflected by the documents of the same original survey. The limits of the properties claimed by the respective parties must depend upon the intent and actions of the original surveyor and of the land department officials, and it is to the documents executed by them that the chancellor largely turned for elucidation. We think his conclusion is supported by substantial competent evidence.
A further contention of appellants as to this aspect of the case is that appellees have no title to any of the islands described in the complaint because the deed from the state to their predecessors in title did not convey title to any land in Section 12, did not describe any land with sufficient accuracy to identify it, and because the described 75 acres of the unsurveyed part of the township has never been officially surveyed or identified. Appellees counter that no survey was necessary for conveyance of swamp and overflowed lands but that it was sufficient only that the lands be identified for purposes of the conveyance.
The case of South Florida Farms Co. v. Goodno, 1922, 84 Fla. 532, 94 So. 672, although not factually parallel, was one wherein the Florida Supreme Court recognized that no survey of swamp and overflowed lands is necessary as a prerequisite to valid conveyances of such lands. The court in its opinion made the following statement:
"The act of Congress granting swamp and overflowed lands to the states is not a grant of such lands by legal subdivisions. It grants `the whole of the swamp and overflowed lands, made unfit thereby for cultivation.' U.S.Comp.St. § 4958. The act requires the Secretary of the Treasury to transmit to the Governor of the state accurate lists and plats of the lands granted, and upon request to issue patents therefor.
"Where the whole of a township or of a section is `swamp and overflowed land' that is `wet and unfit for cultivation,' within the meaning of the act of Congress of September 28, 1850, a subdivisional survey of the township or section would not be necessary to enable the Secretary of the Interior to determine whether `the greater part of' the township or section is `wet and unfit for cultivation,' so as to be covered by the grant; but in such cases the lists and plats of the lands may be made by reference to surveyed lines and their projected extensions or to natural boundaries, and patents may be issued for the lands that are within the grant according to such lists and plats whether the lands be surveyed or unsurveyed."
The court concluded:
"As the plaintiff, the South Florida Farms Company, claims under the patent covering the unsurveyed portions of sections 28 and 30, and as the defendant claims under the patent covering `the whole or fractional sections 28, 30,' which do not cover the unsurveyed portions of the sections, the verdict and judgment for the defendant are erroneous, since the lands described in the declaration cover the unsurveyed portions of the sections to which the plaintiff shows title, and no superior right by adverse possession or otherwise of the defendant is established."
In Wright v. Roseberry, 1887, 121 U.S. 488, 7 S.Ct. 985, 30 L.Ed. 1039, the court declared that the difficulty of identifying swamp and overflowed lands could not defeat or impair the effect of the granting clause by whomsoever such identification was required to be made but that, when identified, the title would become perfect as of the date of the act. The patent, continued the court, would be evidence of *521 such identification and declaratory of the title conveyed. It was further stated that the function of the patent is to make the description of the lands definite and conclusive as between the United States and the State. The following observation was also made by the court:
"The result of these decisions is that the grant of 1850 is one in praesenti, passing the title to the lands as of its date, but requiring identification of the lands to render the title perfect; that the action of the secretary in identifying them is conclusive against collateral attack, as the judgment of a special tribunal to which the determination of the matter is intrusted; but, when that officer has neglected or failed to make the identification, it is competent for the grantees of the state, to prevent their rights from being defeated, to identify the lands in any other appropriate mode which will effect that object."
All the lands involved in this controversy were conveyed as swamp and overflowed lands by patent to the State of Florida under the Swamp and Overflowed Lands Act of Congress of September, 1850. The chancellor, having made his holding as to appellants' boundaries, then concluded that the description, "all unsurveyed part of Township 32 South, Range 18 East * * * according to the official plats of survey * * *," had a definite, distinct, and well-understood meaning to the Trustees of the Internal Improvement Fund, grantees of Patent 33 and grantors of deed 15,199 under which appellees claim title to the islands involved.
Exhibit 7 of appellees, considered along with the other evidence by the chancellor in deciding that the controverted islands vested in appellees under the description contained within their conveyance, is a part of the land sales records of the State of Florida. According to the testimony of an employee of the State of Florida having custody of land records, the method employed as exemplified by exhibit 7 was to prepare a map of the township involved in a sale. That map indicated what land had been sold by the trustees to different purchasers. As sections or other parts of the township were sold, the practice was to write on the map within that portion of the township sold the number of the Trustees' deed. Examination of exhibit 7 reveals that it depicts the sale of many parcels of land, with the number 11,659 indicating sales by the trustees to Florida Land and Improvement Co. That number appears on the map to represent conveyances of all the government lots in the township, including Lots 2, 7, and 8. Across that portion of the map of the township showing islands in the Little Manatee River is written the number 15,199, or the number of the deed to Dischong under which appellees base their claim.
It appears that this exhibit, representing as it does a part of the land sales records of the State of Florida, could justifiably have been considered by the chancellor along with the other evidence.
Appellants advance certain documents showing various conveyances in their deraignment of title. However, we do not find that either Patent No. 4 by which the fractional lots were conveyed to the State of Florida nor the deed by which the Trustees of the Internal Improvement Fund conveyed the fractional lots to appellants' predecessors in title give any indication that it was intended the government lots should embrace the islands or parts of islands in question.
Without detailing the other arguments of appellants, we may state that we find no basis for a holding that appellees are bound and estopped by a prior order constituted within a circuit judge's dismissal of one of the parties from a tax foreclosure suit. Neither can we say that the tax assessment data introduced in evidence showing certain discrepancies in acreage and inconsistent assessments can have the effect of establishing appellants' *522 title or of requiring a departure from the rules of boundary.
It must be remembered, that lands of the sort here contested were considered almost valueless during the early history of our state. The jurisprudence of Florida as well as that of other states includes many cases through which the courts have been confronted with the necessity to interpret data made to a degree opaque, not only by the passage of time, but by the questions arising from discrepancies. In this regard, a statement made by the United States Supreme Court in the case of United States v. Lane, supra, concerning lands along the shore of a lake in Louisiana which had been surveyed in the year 1839 may have some pertinence:
"Considering the circumstances in respect to the character and value of the lands, the wildness and remoteness of the region, and the difficulties surrounding the work of the surveyors, the failure to run the lines with more particularity was not unreasonable, and we are constrained to agree with the lower court in holding that the waters of the lake, and not the traverse line, constitute the boundary."
Where a surveyor had been sent in 1846 into a wilderness area of Florida consisting of then valueless swamp and overflowed lands, beset with all the difficulties attendant upon survey of lands of that nature, the courses which he ran might understandably follow at times along lines which were more or less variant. Also understandable, then, is the general rule that the natural monuments represented by the shore lines ordinarily prevail over the meander lines.
Various matters have been raised which involve sovereignty rights of the State of Florida. We therefore pause to interject that any rights which the State of Florida may have or may subsequently assert with reference to the property involved are not prejudiced by any holdings which we here make but should be adjudicated in appropriate proceedings in which the State is a party litigant.
The record on appeal in this cause is an enormous one, encompassing many lengthy exhibits, documents, and the pleadings, as well as over one thousand pages of testimony, much of it of a technical nature. At the request of all the parties, the chancellor personally visited and traversed by boat each of the streams in the principal areas of dispute, not regarding the visit as evidence, but viewing its results as valuable to him in more thoroughly understanding the evidence and testimony. We have carefully considered the record, the decree of the chancellor, and the able presentations of counsel and have concluded that substantial competent evidence supports the chancellor's decision. The final decree is affirmed.
Affirmed.
ALLEN, A.C.J., and LOVE, WILLIAM K., Associate Judge, concur.
NOTES
[1] "The evidence conclusively shows a depth of water at mean low tide sufficient for use by boats of considerable size and drawing from one and one-half to two feet of water and further finds that all of said streams are used for commercial purposes and all of said branches are navigable in law and in fact."
[2] "* * * that the south boundary of government Lot 2 in Section 12, Township 32 South, Range 18 East, is the highwater mark on the north bank of the north branch of the Little Manatee River and that plaintiff Miller has no title to the lands described in Paragraph 2 of the Complaint; that the highwater mark on the south bank of the south branch of the Little Manatee River is the north boundary of government Lots 5 and 6 in said section, and that the plaintiffs East Coast Land Company, a Florida corporation, Ruskin-Manatee Realty Corp., a Florida corporation and F & M Sales Corporation, a Michigan corporation, have no title to the lands described in Paragraph 3 of the Complaint, that lie north of the highwater mark on the south side of the south branch of the Little Manatee River; and plaintiff Lopez has no title to the lands described in Paragraph 1 of the Complaint, and that none of the lands claimed by plaintiffs Lopez and Miller and described in Paragraphs 1 and 2 are encompassed within the boundaries of government lots 2 and 6, and that no part of the lands described in Paragraph 3 which lie north of the ordinary highwater mark on the south bank of the south branch of the Little Manatee River are encompassed within the boundaries of government Lot 5."