THOMAS, Justice.
This litigation originated as an action by the appellant, Jack C. Stein, against the appellee, Brown Pi'operties, Inc., for specific performance of a contract to convey about 186.25 acres of land on Key Largo in Monroe County. It was stipulated in the agreement, designated “deposit receipt,” that the appellee should receive the sum of $900 an acre, the total acreage to be determined by “a survey to be made.”
The contract was executed 27 April 1955.
According to the bill the seller furnished an abstract of title, as it had agreed to do, and the survey was made. The appellant was advised by an attorney, whom he employed to examine the abstract and surveyor’s report, that the appellee held marketable title to 132.3 acres at most; that title to the remainder of the 186.25 acres was not marketable because it was partly “bottom” and partly submerged land.
Before instituting the suit the appellant tendered to the appellee $152,000 which added to the deposit of $10,000 represented the purchase price of 180 acres at $900 an acre, the appellee having conceded that it did not have marketable title to 6.25 acres. This tender was made on condition that it was eventually determined by the Supreme Court of Florida that the appellee was holder of good and marketable title to the 180 acres, or that appellee establish such title.
It was further alleged in the bill of complaint that counsel for the parties had been informed by the Land Agent for the De *497 partment of Agriculture representing the Trustees of the Internal Improvement Fund that the State claimed title to all the property, involved in the transaction, that extends beyond the high-water line, regardless of the fact that the original patent from the federal government contained a description of a specific number of acres. The property in controversy is described as all that part of Government Lot 1 and the North-
west quarter of Section 33, Township 61 South, Range 39 East lying South of U. S. Highway No. 1.
In order that the reader may understand the situation with which we are dealing the following map of the survey, prepared by G. A. Crawshaw who was employed by the appellee pursuant to the contract, is made a part of this opinion.

*498 The appellant sought a decree deciding the amount of land to which the appellee held marketable title and offered in the bill to pay for each acre the amount specified in the contract.
Because of the interest of the State, obvious from the allegations of the bill of 'Complaint, the Trustees of the Internal Improvement Fund, represented by the Attorney General, sought and were granted permission to intervene, to which the original parties offered no objection.
In substance the chancellor held that “as between” the appellant and appellee the latter had “sufficient” title to entitle it to receive payment for the entire ISO acres at the price stated in the contract.
Before proceeding with a discussion of the decree, the contentions of the parties and the points presented here we observe, in the hope of minimizing the complexities of the litigation, that the land involved falls in three categories: the upland consisting ■of 130 acres, the part subject to overflow of the tides, about 33 acres, and the portion submerged in the Atlantic Ocean, about 17 acres. These are approximate figures.
As a preface to this holding, announced in a summary decree, the chancellor gave his view of the respective positions of appellant, appellee and intervenors. He commented that the appellee contended it owned the whole tract in fee simple; that even if it owned but 130 acres in fee simple it had “a qualified or conditional title of value” to the 50 acres of tidal and submerged land, “by virtue of the Butler Act of 1921 [F.S.A. §§ 271.01-271.08] giving the owner * * * the right to improve the channel, and that the 1951 Act [Chapter 26776, Laws of Florida, F.S.A. § 253.12] is unconstitutional if construed to deprive [the owner] of this right without compensation * *
The chancellor remarked, simply, that the Trustees claimed title to the tidal and submerged lands under the 1951 Act, supra. In the main brief of the Attorney General it is stated that this was a misconception of the Trustees’ position as they asserted such title solely by virtue of the admission of the state to the Union, and consequently they contend that there was no occasion to pass upon the validity of the Act.
Plainly the parties were dealing with a single tract of land, although it was comprised of a government lot and a quarter section, and no provision was contained in the contract for transfer of a portion of the tract in event title to part of it was found unmarketable.
The chancellor concluded that the “State” could not as an intervenor question the title to the 50 acres of tidal and submerged lands but would have to do so in a timely suit for that purpose inasmuch as the 'State’ intervened subject to the rights of the original parties. This may be true but the claim of the Trustees did present issues very material to a determination of the rights of the contracting parties. In any event, we have held that even when there is no intervention by the State and it is apparent to the court that the right of the State to land in litigation is involved, the court must take cognizance of such right. Williams v. Guthrie, 102 Fla. 1047, 137 So. 682.
This thought of the chancellor that the State should initiate litigation with regard to its claim affecting the tidal and submerged land doubtless led to the language in the decree already quoted that “as between the original parties to this suit” the appellee had “sufficient title” to perform under the contract. The appellant, Jack C. Stein, asserts that this conclusion was based on the holding that Chapter 26776, supra, repealed Chapter 8537, supra, and was unconstitutional because it deprived the upland owner of rights which vested under the latter.
It is clear to us that the issues introduced by the Trustees cast such doubt on the *499 marketability of the title to the submerged and tidal portions that the appellant should not be required to pay for them at the rate of $900 per acre. But it seems to us that there is no occasion to go further and explore the relative rights of the State and the owner of the upland for no marketable title was created under the 1921 Act, supra, and it cannot be said that any potential or prospective right of the owner of the upland to the submerged and tidal portions can be dignified as marketable title under the provisions of contract. These parcels have not been and may never be improved to the extent that land may be created to which marketable title may vest even were the position of the appellee chosen over that of the State. In other words, adopting the construction most favorable to the owner, or prospective owner, of an interest in the submerged and tide lands the present physical condition of the property is not such that it can be said the title to it is marketable for at best this situation could arise only when it is raised above the surface of the ocean and above high tide.
Although the “source” of title to submerged land, adjacent to upland affected by the acts, is the statutory right and not the process of raising it above the surface of the water by filling and such improvement is the proprietary use contemplated by the statutes providing for the qualified grant, Trumbull v. McIntosh, 103 Fla. 708, 138 So. 34, no title is acquired until such submerged lands are filled in or permanently improved. Hayes v. Bowman, Fla., 91 So.2d 795.
In commenting upon these features of the controversy we do not express an opinion that the tide and submerged lands are of such character or location that they have been or are affected by any of the acts of the legislature dealing with the rights of upland owners in adjacent submerged or tidal lands.
We come now to the question whether or not some special right came to the ap-pellee because the property was conveyed to its predecessor in title by patent from the government, a point in the intervenors’ brief to which we have already referred. It is shown on the plat that most of the government lot is either under the Atlantic Ocean or is washed by the tides.
The appellant concedes that appel-lee’s predecessors received marketable title to the upland by patents, in 1882 and 1883, the United States Government having been ceded lands above high tide by treaty with the King of Spain in 1821, 8 Stat. 252. Title to tidal lands became vested in the State of Florida upon its becoming a member of the Union 3 March 1845, 5 Stat. 742, subject, of course, to right of Congress in respect of the requirements of navigation. Under the common law of England the crown held title to the bottoms of navigable and tidal waters, and to the foreshore, in trust for the people and this rule applied to the colonies and private rights extended only to the high-water mark. This was the rule under the Spanish Law as well. Brickell v. Trammell, 77 Fla. 544, 82 So. 221.
In the opinion in that case filed in 1919, we find the significant statement that “those claiming ownership below high-water mark must show the sources and muniments of title from competent authority to make such a grant against the rights of the public in the shores and waters of navigable waters in this state.”
The Supreme Court of the United States held in Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 570, 38 L.Ed 331, that “[g] rants by congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future state when created * * *.” In that case the appellant had received from the federal government land bounded by the Columbia River. Later the land was included in the boundaries of the State of *500 Oregon. Even though the appellant’s vesting of title from the government preceded admission of the State to the Union, his title to land below high-water mark was held subordinate to that of the State.
It seems to follow that by the patents from the federal government to ap-pellee’s predecessor in title no peculiar right was obtained to that part of the land under the ocean or under tidal waters as the land below the high-water mark was sovereignty land. Trustees of Internal Improvement Fund v. Claughton, Fla., 86 So.2d 775. Actually, appellee concedes in its brief “that when Florida was admitted to the Union in 1845, it acquired title to the foreshore and submerged lands involved in this litigation.”
The parties to this controversy have presented interesting and able arguments on the effect of the acts we have cited upon the rights of owners of property facing waters and in support and criticism of the chancellor’s ruling with reference to the interference by the later act of rights vested by the earlier act. We are but repeating when we say that we think a discussion of these subjects, though they are of great importance in this State where land values are so greatly affected with the presence or nearness of water, would in this case be purely academic. And being such, comment upon them would, in the future, be damned as obiter dictum.
This decision should be anchored to the contract the parties freely entered to buy and sell and approximate number of acres of land to be fixed by a survey at a stated price provided the title was found to be marketable. In effect the survey demonstrated that but 130 acres existed to which the appellee held such title because only that area was “high and dry.” Whether any of the remaining 50 acres will ever attain that status is purely speculative. From a study of our opinion in Duval Engineering & Contracting Co. v. Sales, Fla., 77 So.2d 431, and Hayes v. Bowman, supra, it appears that no title could come into being until the submerged land had been improved by filling in extension of the upland.
In these circumstances there was no necessity of passing upon the validity of Chapter 26776, supra. And it has often been announced by this court that the constitutionality of an act will not be tested unless necessary to a decision of a controversy. State ex rel. McMullen v. Johnson, 102 Fla. 19, 135 So. 816; Florida Growers, Inc., v. City of Stuart, 105 Fla. 538, 141 So. 735; State ex rel. Losey v. Willard, Fla., 54 So.2d 183.
The appellee has advanced the argument that some sort of estoppel should be marked against the State because for many years taxes have been levied and collected on all the property, upland, tidal and submerged. We do not understand how application of the doctrine could, under the circumstances peculiar to this dispute, work a marketable title in appellee, but we do not pursue the matter because it does not appear to have been entertained by the chancellor.
The grant of specific performance depends on the facts of the case and even when the contract sought to be enforced is unambiguous specific performance will not be granted as a matter of right, but in the discretion of the chancellor to be exercised in the light of the circumstances. Wood v. Hammel, 132 Fla. 164, 181 So. 145; Todd v. Hyzer, 154 Fla. 702, 18 So.2d 888.
For the reasons we have given we think the decree must be reversed. We remand the cause to the chancellor with directions to proceed in accordance with the views expressed in this opinion.
Reversed.
TERRELL, C. J., THORNAL and O’CONNELL, JJ., and WIGGINTON, District Judge, concur.