222 So.2d 10 (1969)
TRUSTEES OF the INTERNAL IMPROVEMENT FUND of Florida, Petitioners,
v.
Julius WETSTONE, Trustee, Respondent.
No. 37584.
Supreme Court of Florida.
March 26, 1969.
Rehearing Denied May 19, 1969.
Earl Faircloth, Atty. Gen., and J. Kenneth Ballinger, Asst. Atty. Gen., for petitioners.
Howard J. Rhoads, of Allen, Knudsen, Swartz, Richardson & DeBoest, Ft. Myers, for respondent.
ADKINS, Justice.
This cause is before the Court for review on conflict certiorari of the decision of the District Court of Appeal, Second District, reported in Trustees of the Internal Improvement Fund of Florida v. Julius Wetstone, Trustee, 209 So.2d 698.
The Respondent, Julius Wetstone, will be referred to as Plaintiff and the Petitioners, Trustees of the Internal Improvement Fund of Florida, will be referred to as Defendant.
Plaintiff filed a complaint for declaratory judgment seeking the determination of the boundary line that separated his ownership of Little Pine Island, hereinafter referred to as the "Island," from that *11 of the Defendant in the surrounding sovereignty lands. The outer edges of the Island are heavily populated with mangrove swamp areas.
A government survey in 1875 by H. Jenkins meandered the outer limits of the Island. Thereafter, the State was granted a patent covering the Island, under the Swamp Lands Act, and Plaintiff acquired title through mesne conveyances. The description in the patent and each conveyance was by government lots.
Plaintiff had a bulkhead line established and applied to the Defendant for the purchase of all sovereignty lands lying between the bulkhead line and Plaintiff's land. At this point a dispute arose between Plaintiff and the Defendant Trustees as to the location of the line dividing the upland ownership of Plaintiff from the sovereign ownership of the Defendant Trustees. Plaintiff then filed his complaint seeking declaratory judgment, alleging the inability of a competent surveyor to locate any line on the ground as the mean high-tide line. Plaintiff sought to have the meander line declared as the boundary line and not the line of mean high-tide. Plaintiff also sought to confirm title in himself as against the Defendant Trustees to all lands within the meander line.
At the hearing, a reputable surveyor testified on behalf of Plaintiff. From his testimony it appears that the mean high-tide line subscribing the Island could not be located with any certainty, the allowance for error in its location varying from several hundred feet to a quarter of a mile. The nearest tide gauging station that gave a verticle reference point (i.e. the elevation of the plane of mean high-tide above the zero plane of the mean sea level bench marks) was eight miles away from the Island. This verticle reference point from which a surveyor would normally run his line would be compounded over the course of eight miles to create an excessive tolerance on the almost horizontal plane so that such tolerance would vary from several hundred feet to a quarter of a mile when it reached the Island. The mangrove lands were so gradual in their slope as to be almost flat. Also, there were soft spots and hard spots in the land so that a difference would result when the surveying rod was put down in one spot or another. From his examination of a U.S. Coast Guard survey of 1866-1867, the surveyor testified there had been no change in the edge of vegetation since 1866.
The surveyor also testified that determinations of mean high-tide elevation had generally been made for the purpose of navigation and not for the determination of land ownership.
By reference to the Jenkins' field notes and location of the section lines which were surveyed on the Island, the meander line as run by Jenkins can be located. The surveyor testified that the meander line extends bayward from the bulkhead line on approximately 20 per cent of the perimeter of the Island.
The original Federal survey showed the acreage within the government lots, sections and fractional sections as patented to the State. By the same description as it took title, the Defendant Trustees conveyed the Island to the first private owners and recited this same acreage in the deed. This acreage was based on the meander line as the boundary line and Plaintiff has paid taxes on approximately the same acreage.
The Defendant Trustees did not offer any evidence at the trial. The trial court declared the boundary line to be the meander line and confirmed title to the land lying interior to the meander line in the Plaintiff as against the Defendant Trustees. This judgment was affirmed by the District Court of Appeal. 209 So.2d 698 (Fla.App.2d Dist.)
Defendant Trustees petitioned this Court for certiorari claiming conflict with Lopez v. Smith (Fla.App.2d Dist.) 145 So.2d 509 *12 and Pierce v. Warren (Fla. 1950) 47 So.2d 857, in that the establishment of a meander line as a boundary line in the instant case would include areas of sovereignty lands and the Court could not validate a 1905 conveyance of such sovereignty lands by calling them swamp and overflowed lands. The Defendant Trustees did not have the authority to convey sovereignty lands prior to the enactment of Chapter 7304, Laws of Florida, Acts of 1917, Fla.Stats. (F.S.A.) Sec. 253.12 et seq.
Defendant's reliance on Lopez v. Smith, supra, is misplaced, as this case also arose out of the Second District. Conflicts of two decisions of the same District Court of Appeal cannot activate our conflict jurisdiction. Shaw v. Puleo (Fla. 1964) 159 So.2d 641.
The question to be determined is whether, under the circumstances of this case, the meander line of the Jenkins' survey could be considered as a boundary separating the swamp and overflowed land from the sovereignty land. If the land involved was sovereignty land and was not swamp and overflowed land title could not be quieted and confirmed in the Plaintiff, as the Defendant Trustees at the time of their original conveyance had no authority to convey sovereignty lands. See Pierce v. Warren, supra.
The patent from the United States under the Swamp Land Act was made pursuant to instructions from the General Land Office of the United States describing lands which had been selected as "swamp and overflowed lands." The patent was dated December 17, 1879 and was based upon the government survey made by Jenkins in 1875.
American Law of Property, Volume III, Sec. 12.114, p. 436, (1952) discusses the purpose of the meander line in such a survey as follows:
"The meander lines established by the survey of the federal government were usually placed a short distance back from the water's edge, but sometimes they cut across small patches of water. No attempt was made to follow the minor sinuosities of the shore, and these lines were merely intended to mark the general contour and to enable the General Land Office to compute the acreage in the resulting government lots of which they should take cognizance in disposing of them."
However, the same author recognizes certain exceptions,
"* * * when the boundaries of government lots appear from the plat of the survey to abut on a stream or a body of water which did not exist, or which is not located within what the courts have considered a reasonable distance from its indicated location, there is no natural object or monument to mark the boundary and resort must be had to the secondary evidence afforded by the courses and distances of the meander line as outlined on the plat and described in the field notes. This has the effect of making the meander line in a relatively small number of cases the boundary line of the government lots thus affected."
Public officers in making sales by necessary implication may make the meander line the boundary line. See 11 C.J.S. Boundaries § 30, pp. 574-575.
The Florida Court has also recognized situations in which the meander line of an official survey would constitute a boundary. The Court in South Florida Farms Company v. Goodno, 84 Fla. 532, 94 So. 672 (1922) said:
"The rule of general application is that, where a patent to public land refers to the field notes and plats of an official survey, which field notes and plats show that the land is bounded by a permanent body of water, and that in making the official survey the waters were in fact faithfully meandered, the water line, and not the meander line, is in general the boundary. * * * But where an official *13 survey meanders not a permanent body of water, but low marsh or similar lands that are adjacent to other lands being surveyed, the meander line is the boundary."
See also 3 F.L.P. Boundaries, § 16.
This Court has previously been confronted with the problem of determining the ordinary high-water mark where peculiar topographical features were involved. In Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927), the ordinary high-water mark around Lake Okeechobee could not be located because of topography unique to that area. The Court pointed out that the State owned the beds of all navigable lakes to ordinary high-water mark, however shallow the water may be at the outside lines or elsewhere, if the water is in fact a part of the particular lake that is navigable for useful purposes. The Court then said:
"In flat territory or because of peculiar conditions, there may be little if any shore to navigable waters, or the elevation may be slight and the water at the outer edges may be shallow and affected by vegetable growth or other conditions, and the line of ordinary high-water mark may be difficult of accurate ascertainment; but, when the duty of determining the line of high-water mark is imposed or assumed, the best evidence attainable and the best methods available should be utilized in determining and establishing the line of true ordinary high-water mark, whether it is done by general or special meandering or by particular surveys of adjacent land. Marks upon the ground or upon local objects that are more or less permanent may be considered in connection with competent testimony and other evidence in determining the true line of ordinary high-water mark. When the line of ordinary high-water mark is duly ascertained and established by competent authority, such line should be regarded as the true line, unless duly impeached for fraud or mistake."
The Court further said:
"Where sales and conveyances of unsurveyed swamp and overflowed lands are made by the trustees of the internal improvement fund, it is the duty of the state to survey the lands intended to be conveyed so that the location and boundaries thereof may be identified and established. * * * A conveyance of all of an unsurveyed fractional township or section of swamp and overflowed lands which borders on a navigable lake or other body of navigable water, carries title to the true line of ordinary high-water mark that has been or that should thereafter be legally established; and, if the acreage stated in the conveyance of swamp and overflowed lands is less than the true acreage outside of the true line of ordinary high-water mark of the adjacent navigable water, such deficit does not authorize an extension or contraction of the true water line or give the grantee any sovereignty land within or on the lower or lake side of the true water line. The grantee takes with notice that the conveyance of swamp and overflowed land does not in law cover any sovereignty lands, and that the trustees of the swamp and overflowed lands as such have no authority to convey sovereignty lands."
It thus appears that the determination of the mean high-tide line is a question of fact, and the duty rested upon the State to survey the land so that the boundaries could be identified and established. The Defendant Trustees point out that they are attempting to prepare a permanent uniform set of standards for the use of professional land surveyors and engineers in determining methods of ascertaining mean high-tide line. The aspects of tidal phenomena, the limitation of the area encompassed within a local tidal observation, variations in physical characteristics of beach and shore, the possible rising of mean sea level in Florida, *14 are all factors which must be met in determining the line of mean high-tide. See 18 Fla.Law Rev., 553, 556 (Spring 1966), "The High Water Mark: Boundary Between Public and Private Lands" by Norwood Gay. The line selected by the proposed procedure may not be the actual mean high-tide line.
The evidence in the instant case clearly shows the following:
(a) the true mean high-tide line cannot be located;
(b) the meander line of the Jenkins' survey can be located through the use of the original field notes;
(c) the patent of the Swamp and Over-flowed Lands described the property patented therein "according to the official plats of survey of the said lands returned to the General Land Office by the Surveyor General;"
(d) from the record it appears that the Defendant Trustees have made no effort to establish a boundary other than the meander line and, at best, may in the future adopt certain standards from which an estimated mean high-tide line may be determined;
(e) the acreage conveyed by the Defendant Trustees to Plaintiff predecessor in title was based upon the acreage referred to in the original government or Jenkins' survey.
In regard to the latter, it is well settled that in locating a boundary line natural monuments prevail over courses and distances and courses and distances prevail over quantity. Calder v. Hillsboro Land Company (Fla.App. 1960) 122 So.2d 445, 457. In the instant case, the natural monument was the body of water surrounding the Island, or, the mean high-tide line. This natural monument could not be located with any legal precision. The only "courses and distances" available in this case were those for the meander line. The "quantity" was the acreage referred to in the original government survey. The other elements of the description, through ambiguities and uncertainties, have lost their superior value and resort may be had to quantity. See Lopez v. Smith (Fla.App. 1962) 145 So.2d 509, 518. In Horne v. Smith (Fla.) 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68, the Court considered a government survey bounded on the west by a meander line. Between the west boundary and a navigable river lay a body of land containing 600 acres which was never surveyed. The Court, in holding that the meander line was the boundary, considered the fact that the area conveyed was given as 170 acres and this negatived any intent to convey over 700 acres.
Under the circumstances of this case, we hold that the meander line constituted the boundary line between the swamp and overflowed lands and the sovereignty lands and the District Court was correct in affirming the trial court. The writ of certiorari is discharged.
ROBERTS, DREW, THORNAL and CALDWELL (Retired), JJ., concur.
ERVIN, C.J., dissents with opinion.
BOYD, J., dissents and concurs with ERVIN, C.J.
ERVIN, Chief Justice (dissenting):
The decision of the District Court conflicts with all prior landmark Florida decisions relating to the subject of boundaries between privately owned riparian uplands and submerged sovereignty lands under navigable waters.
Prior to the instant decision, all of the Florida decisions have held that submerged sovereignty lands under navigable waters that have not been sold as such by the Trustees of the Internal Improvement Fund pursuant to specific laws for limited sales thereof, continue to be owned by the State up to the line of mean high water adjacent *15 uplands and are protected by the inalienable trust doctrine.
The instant case for the first time holds that an ancient meander line, surveyed by one H. Jenkins in 1875 as a perimeter circumscribing an island (Little Pine) in navigable waters and shown on a U.S. governmental lot survey map, is the boundary of the island rather than the island's natural ordinary line of mean high water.
It is obvious this meander line extends several hundred feet, and even as far as a quarter of a mile, offshore in navigable waters along sectors of the border of the island.
The upland proprietor of the island, Respondent Julius Wetstone, Trustee, is a successor in title to the island. His original predecessor in title acquired the island by a conveyance from the Trustees of the Internal Improvement Fund in 1905. The island had previously been patented by the Federal Government to the State as swamp and overflowed land pursuant to the 1875 survey. The Trustees conveyed the land as government lots to Wetstone's original predecessor pursuant to a description thereof derived from the Jenkins survey of 1875 which appeared in the patent. The Trustees could not sell any sovereignty lands in 1905 because they were not given authority in law to do so until 1917.
Wetstone succeeded in getting the state and county authorities to establish, pursuant to law, a bulkhead line around the island. Such a line is usually fixed closely contiguous to the shoreline. There was uncontradicted testimony from Wetstone's surveyor that the 1875 meander line extends bayward from the bulkhead line along approximately twenty per cent of the perimeter of the island.
When Wetstone sought to purchase all sovereignty land within the bulkhead line, dispute arose between him and the Trustees as to the location of the boundary dividing his island upland ownership and the sovereignty land owned by the State. Wetstone sued, seeking a declaratory judgment that the 1875 meander line was the boundary.
The decision in the Circuit Court and as affirmed by the District Court of Appeal, was in favor of Wetstone's position. It was held the 1875 meander line was presumed to be the island's boundary and encompassed the acreage in the conveyance. The justification for this holding, based on said presumption, is that the line of mean high water of the island is not locatable by an engineering survey. This was the testimony of a surveyor in behalf of Wetstone. His reasons for this conclusion are set forth in the majority opinion.
The majority opinion accepts the premise that the seeming ineluctability of locating by survey the line of mean high water of the island justifies acceptance of the ancient meander as covering the acreage described in the conveyance "under the circumstances of this case."
But as stated previously in this dissent, this premise is contrary to all landmark decisions. For example, Martin v. Busch, 93 Fla. 535, 112 So. 274, which is quoted from extensively in the majority opinion, lays down specific rules that have been followed consistently by the Trustees and the public for many years in determining boundary questions of this kind.
In Martin v. Busch, our Court points out that the authority of the Trustees as to swamp and overflowed lands on the one hand, and as to submerged and marsh lands by virtue of sovereignty on the other, is separate and distinct; that they are trusts conferred by separate statutes enacted many years apart for different purposes. It is well established the Trustees have never been authorized by the same state laws to sell sovereignty lands on the same basis as it does swamp and overflow lands. Limited sales of the sovereignty lands are strictly regulated pursuant to separate laws, including, in the last few years, the bulkhead laws. As a part of the state procedures designed to lend vitality to the inalienable trust doctrine respecting navigable *16 waters, notice of proposed sales of sovereignty lands must be given to other upland proprietors and to public units that may be affected. See Hayes v. Bowman (Fla.), 91 So.2d 795, and Zabel v. Pinellas County Water and Nav. Con. Auth. (Fla.), 171 So.2d 376.
It would unduly lengthen this dissent by quoting extensively from the long opinion in Martin v. Busch. However, I refer to the quotation from that case appearing in the majority opinion. It states that the grantee in a swamp and overflowed land conveyance "takes with notice that the conveyance * * * does not in law cover any sovereignty lands, and that the trustees of the swamp and overflowed lands as such have no authority to convey sovereignty lands." This quotation makes it clear that such a conveyance of swamp and overflowed lands "which border[s] on a navigable lake or other body of navigable water, carries title to the true line of ordinary high-water that has been or that should thereafter be legally established." (Emphasis added.)
Further, and with complete applicability to the problem in this case, the Court in Martin v. Busch said:
"* * * if the acreage stated in the conveyance of swamp and overflowed lands is less than the true acreage outside of the true line of ordinary high-water mark of the adjacent navigable water, such deficit does not authorize an extension or contraction of the true water line or give the grantee any sovereignty lands within or on the lower or lake side of the true water line." (Text 285.)
Following the quotation from Martin v. Busch in the majority opinion is the statement that a duty rested upon the state to survey the land in dispute so that the boundaries could be identified and established. Then follows this further statement, "the Defendant Trustees have made no effort to establish a boundary other than the meander line and, at best, may in the future adopt certain standards from which an estimated mean high-tide line may be determined." (Emphasis in majority opinion.)
These statements as to the present duty of the Trustees to establish the line of mean high water for the island are subject to serious question, particularly if it is intended thereby that any default of the Trustees in not having theretofore established a water line different from the meander has the effect of giving Wetstone title to the sovereignty lands within the meander. We should not lose sight of the fact Wetstone has not asked the Trustees to officially locate the line of mean high water to the island, but sought in his suit to establish the 1875 meander instead.
Even accepting as correct that it is still the duty of the Trustees, as trustees of the swamp and overflowed lands (public lands), to cause a survey of the island to be made to officially establish such a boundary for the benefit of both Wetstone and the Trustees, the boundary to be established would not be the 1875 meander, but the "true line of ordinary high-water mark." Cf. Martin v. Busch, supra.
In Martin v. Busch it is held that a conveyance by the Trustees of swamp and overflowed land bordering navigable waters contemplates the line of ordinary high water which "should be established by an authorized official survey" (text 287) adopted by the Trustees and that even a reliable private survey (Keller) will not suffice unless it has been offically adopted by the Trustees. Nor has it ever been held that meanders in old governmental surveys used in patenting swamp and overflowed lands to the State bound the Trustees to accept such meanders in determining boundaries of sovereignty lands.
Merely because it is a difficult and seemingly ineluctable task to locate by survey the line of mean high water dividing swamp and overflow land from navigable waters is no justification for accepting an old government lot survey meander in lieu thereof. In Martin v. Busch, supra, it is pointed out *17 that even though peculiar conditions of terrain along shore, such as flat territory, absence of any or little shore to navigable waters, slight elevation, and the water at the outer edges is shallow and affected by vegetable growth, may render "the line of ordinary high-water * * * difficult of accurate ascertainment," yet when it is the duty to determine such a line the best evidence attainable and the best methods available "should be utilized in determining and establishing the line of true ordinary high-water mark." (Text 283.) Thus difficult conditions hindering a survey of the water line is no basis for accepting the old meander in lieu of the line of true ordinary high water mark. Moreover, the line of such a boundary is to be established by whom? Not by the purchaser or his surveyor, but officially by the Trustees of the Internal Improvement Fund. This is repeated several times in Martin v. Busch, text 284, 285, 286, 287, and 288. A sample thereof reads: "* * * it is the duty of the state to officially determine the limits and existing boundaries of the sovereignty lands under navigable waters on which the sold or conveyed lands [swamp and overflow] border * * *." (Text 285.) To the same effect see Hardee v. Horton, 90 Fla. 452, 108 So. 189, and Pierce v. Warren (Fla.), 47 So.2d 857.
In Pierce v. Warren, supra, certain lands were patented to the State in 1896 on the assumption they were all swamp and overflowed lands (public lands). In 1911, prior to any survey of these lands fixing their boundaries and determining their character, a tract thereof was sold by the Trustees into private ownership. Some eleven years later the Trustees had the lands surveyed and discovered the tract was submerged sovereignty land in Biscayne Bay. The private purchasers of the tract contended their title was valid because no survey had shown them the tract was tideland when they purchased it in 1911. However, our Court, following Martin v. Busch, held the sale was void because the Trustees had no authority in law until 1917 to sell sovereignty land. For the same reason, the title conveyed in 1905 by the Trustees to the original predecessor in title to Wetstone "did not and could not include any sovereignty land," to quote from the Court's language in the Pierce v. Warren case.
To similar effect see: Brickell v. Trammell, 77 Fla. 544, 82 So. 221; Stein v. Brown Properties, Inc. (Fla.), 104 So.2d 495, and Trustees I.I. Fund v. Claughton (Fla.), 86 So.2d 775.
The boundary rules in the preceding landmark cases were reemphasized in a careful and well-reasoned and documented opinion by the late Judge Kanner for the Second District Court of Appeal in the recent case of Lopez v. Smith, 145 So.2d 509. Excerpts from the opinion read as follows:
"A meander line generally is not a boundary, but it only marks the general contour of a shore; * * * the Florida jurisdiction has adhered to the general rule that grants and conveyances of lands bounded by navigable waters carry title to the ordinary high water mark of those waters, making such high water mark the boundary and not the meander line." (Text 515.)
He adds:
"However, a meander line may constitute a boundary where so intended * *." (Text 515.)
Yet even if a mistake had been made by the Trustees in 1905 respecting the meander in its conveyance to Wetstone's original predecessor in title, it could not have been legally intended to include any sovereignty lands in the slightest, since the Trustees had no authority to sell sovereignty lands until several years thereafter.
The Lopez opinion also says:
"It must be remembered, that lands of the sort here contested [the subject lands in that case had many characteristics similar to those in this case] were considered almost valueless during the early history of our state. * * * Where *18 a surveyor had been sent in 1846 into a wilderness area of Florida consisting of then valueless swamp and overflowed lands, beset with all the difficulties attendant upon survey of lands of that nature, the courses which he ran might understandably follow at times along lines which were more or less variant. Also understandable, then, is the general rule that the natural monuments represented by the shore lines ordinarily prevail over the meander lines." (Text 522.)
The Lopez opinion also quotes from South Florida Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672, where we recognized that no survey of swamp and overflowed lands is a necessary prerequisite to a valid conveyance of such lands.
It is noted the District Court in the instant case quotes with approval from the decree of the Circuit Court that the lands "were conveyed out of the state by the Defendants [Trustees of the I.I. Fund] to the first private owners by deed reciting the acreage being conveyed, which acreage was presumptively the area within the meander lines of the Jenkins' survey of 1875." (Emphasis added.) A good answer to this is found in the Lopez v. Smith opinion, text 518 and 519, where Judge Kanner points out that ordinarily the quantity of acreage in a deed is subordinate to other description elements, among them such natural monuments as high water marks. He cites Martin v. Busch, supra, in support. But, of course, the strongest answer to this is the Trustees had no authority in law to include any sovereignty lands in its 1905 conveyance and the presumption is none were included.
The fact that Wetstone has paid taxes on said island lands since 1956 on an acreage basis approximating the acreage within said meander, is hardly any justification for estoppel or claim of title to sovereignty land. See Stein v. Brown Properties (Fla.), 104 So.2d 495. Taxes erroneously paid on offshore sovereignty lands by grantees of adjacent swamp and overflow uplands have never been held to defeat the inalienable trust thereto, the reason being that such a grantee "takes with notice that the [his] conveyance * * * does not in law cover any sovereignty lands * * *." Martin v. Busch, supra, text 285.
It should be remembered Wetstone's suit was not one to require the Trustees to survey the disputed line, if indeed he now has that right. His object, in which he succeeded below, was to have the court declare that the outside perimeter meander of 1875 embraced the acreage of the island, irrespective of the fact no official state survey was ever adopted by the Trustees establishing the boundary.
This precedent of the District Court permitting riparian proprietors on some such basis or pretext as their inability to currently locate by survey a line of mean high water (a natural monument) as a boundary to their uplands, and, instead, use the old meander lines of U.S. Government lot surveys to establish ownership to adjacent offshore submerged lands in navigable waters within such meanders, poses a very real threat to existing rights of people generally to enjoy all navigable waters hitherto protected by the inalienable trust doctrine.
There are hundreds of miles of coasts, islands, keys, and banks of lakes and rivers that border on navigable waters. Most of these are reflected in the meander lines of old governmental lot surveys, which meander lines Judge Kanner points out in Lopez were often established by surveyors in wild terrain, rendering them "more or less variant" from natural monuments. (Text 522.)
If Wetstone and others similarly situated are ultimately successful in extending their titles over navigable waters to these old meanders, the Trustees will be helpless, in many areas, to prevent the submerged areas embraced within such meanders from being dredged and filled (see Zabel v. Pinellas County Water & Nav. Con. Auth., supra), and will lose the purchase money which otherwise would be paid if the Trustees *19 decided it was not inimical to the public interest to sell limited portions of such submerged lands.
It should be relatively easy under this precedent for many owners of upland properties so meandered to show their frontages are bordered by marshes, mangroves, mud flats, and low flat areas, and that there is a lack of survey data, tidal gauging stations, and sea level bench marks, and consequently they are entitled to similar treatment of having old meanders recognized as the water line boundaries of their properties instead of the line of mean high water.
It appears to me this case opens an unnecessary Pandora's box of problems for the people of the state not hitherto contemplated by our laws or decisions and it does so at a time of extremely heightened public interest in the sensitive subject involving protection of the State's offshore areas.
I would quash the decision of the District Court for the reason there is no basis in Florida law in this precise situation for holding a meander line reflected in a U.S. survey of governmental lots and used in patenting swamp and overflowed lands to the State nearly a hundred years ago is the true boundary between such lands and submerged sovereignty lands when it is quite obvious and apparent there are wide areas of open navigable waters inside such meander. It is common knowledge such old meanders very rarely reflect the true boundaries of sovereignty lands. The courts below should not have indulged the presumption such meandor was the correct boundary on the basis the line of mean high water was not locatable when it was obvious there are wide areas of open navigable water inside the meander and the meander had never been accepted officially by the Trustees.
The quashal of the decision should be without prejudice to Wetstone's bringing such action as he may be advised to determine whether any duty is now incumbent upon the Trustees to officially establish the line of mean high water around Little Pine Island; and if it is determined such duty still remains in the Trustees, then Wetstone should have the right to impeach for fraud or mistake, if he can, such line the Trustees may officially establish (see Martin v. Busch, supra, text 283, 284).
BOYD, J., concurs.