KEHOE, Judge.
Appellant, The Florida Board of Trustees of the Internal Improvement Trust Fund, defendant below, brings this appeal from a final judgment entered on April 6, 1977, by the trial court in favor of appellee, Wakulla Silver Springs Company, plaintiff below. We affirm.
This action was filed on November 1, 1971, by appellee against appellant seeking a declaratory judgment as to the location of the boundary line of a tract of land owned by appellee on Key Largo, Monroe County, Florida. The tract owned by appellee is bound on three sides by water and it is admitted that appellant owns the adjacent submerged lands.
The complaint alleges that the waterfront lands owned by appellee were conveyed to its predecessors in title by deeds incorporating the plat of the original United States survey and that appellee and its predecessors in title have paid taxes on the lands based upon that description. Appel-lee admits that the mean high water line (MHWL) is the boundary; however, it alleges that the MHWL cannot be located accurately on these lands because the lands are low, wet, mangrove swamp.
Pursuant to appellee’s motion for summary judgment, the trial court entered a partial summary judgment which held that appellee was the owner of the land in question, but the trial court reserved ruling on the location of the boundaries of the land. Also, appellant filed a motion to dismiss portions of appellee’s complaint. This motion was denied by the trial court on April 1, 1973, and affirmed by this court on appeal in State Board of Trustees of Internal Improvement Trust Fund v. Pineta Co., 287 So.2d 126 (Fla. 3d DCA 1973).
This action was tried non-jury before the Honorable Ignatuis Lester on several days in April, May, and June of 1975. The final judgment entered by the trial judge on April 6, 1977, made extensive findings of fact and conclusions of law. Because of its complete treatment of the questions presented, we believe that the final judgment is deserving of being set forth herein. Further, we hold that the final judgment correctly disposed of the questions involved. The pertinent portions of the final judgment are as follows:
“This action was filed in November of 1971 by Wakulla Silver Springs Company (“Wakulla”) under Chapter 87, F.S. (now Chapter 86, F.S.) seeking a declaratory judgment to determine the location of the boundary line which separates its lands from the submerged lands owned by the defendant, Board of Trustees of the Internal Improvement Trust Fund (“Trustees”). The land at issue is a contiguous tract situated on a small peninsula on the southeast coast of Key Largo and is described as follows:
In Section 32, Township 61 South, Range 39 East:
Government Lot 6
In Section 5, Township 62 South, Range 39 East:
W xk of Government Lot 1
W Va of Government Lot 3
All of Government Lot 2
All of Government Lot 4
Each of the government lots contains wat-erfrontage, being bordered on one or more sides by either the Atlantic Ocean, Rock Harbor inlet or Rock Harbor basin.
“A partial summary judgment was entered on February 23, 1973 which held that Wakulla had title to the lands described above; however, the Court reserved ruling as to the boundaries of those lands. Final hearing was held before the Court, sitting without a jury on the amended complaint and answer in April and May of 1975.
“Wakulla contended at the final hearing: first, that it (or its immediate predecessor in the chain of title) was conveyed title to those government lots by the Trustees in 1943 and 1944; that at that time, the Trustees had the power to convey submerged lands; that if any of the lands at issue were or are below the mean high water line, then those submerged lands were conveyed to it by the Trustees. Second, Wakulla argued that the mean high water line rule does not apply to the west or northern coast of the *708 peninsula because neither Rock Harbor inlet nor Rock Harbor basin are navigable. Third, that the Trustees are both legally and equitably estopped from reclaiming title to the lands at issue; and fourth, that the mean high water line cannot be located reasonably within the foreseeable future.
“The Board of Trustees contended that it has title to all lands lying below the mean high water line; that the mean high water line can be located; and that the meander line of the United States survey neither was nor is a boundary line.
1. Jurisdiction
“This Court has jurisdiction over both the parties to this action and the subject matter of this action, a question which was decided by the District Court of Appeal, Third District in its decision reported at 287 So.2d 126 (Fla. 3rd D.C.A. 1973).
2. The Land
“The government lots at issue are situated on a small peninsula on the southeast coast of Key Largo. The peninsula is bounded on the southeast by the Atlantic Ocean, on the west by Rock Harbor inlet and on the north by Rock Harbor basin. The total acreages recited in the Trustees’ deed of conveyance to Wakulla or its predecessor in title, is 125.5 acres. The following is a drawing of the five government lots involved and the surrounding waters:

“The land itself, except for a small area in the northeast corner is low, flat, wet and covered with a dense growth of mangrove. The elevation of the land in the northeast corner of the property is relatively high. The nature of the land is a complicating factor. Most of the land is so low and flat that a slight vertical error in elevation of mean high water when projected onto the horizontal plane, would result in a substantial error in the location of the boundary line. Further, the mud and dense growth of mangrove add to the surveyors’ problems.

3.History of Land Conveyances in Florida

“The United States acquired from Spain, by treaty in 1819, full property and sovereignty to all lands in Florida except those lands granted and approved prior to January 24,1818. Under that treaty, the United States acquired title to the lands which constitute the beds or shores of the navigable waters as well as all other lands not privately owned. Trustees of the Internal Improvement Fund v. Root, 63 Fla. 666, 58 So. 371 (1912); State, ex rel Ellis v. Gerbing, 56 Fla. 603, 47 So. 353 (1908); and U. S. v. 2,899.17 acres of land, 269 Fed.Supp. 903 (M.D.Fla.1967). Upon its admission to the Union in 1845, Florida acquired the right to own and hold the lands under navigable waters lying within the State, including the shores and space between the ordinary high and low water marks, which are called sovereignty lands. State, ex rel Ellis v. Gerbing, supra. Title to all other lands in the State of Florida remained in the United States.
“Congress, by Chapter LXXXIV, Acts of Congress of the United States, September 28, 1850, 9 Stat. 519 (43 U.S.C.A. § 981 et seq.) granted and set up procedures for conveying swamp and overflowed lands to the State. The Act provided that the Secretary of Interior prepare an accurate list and survey plats of the swamp and overflowed lands and that he transmit these to the Governor of the State. The Governor of the State then submitted a selection list to the Secretary of Interior and certified to the Secretary that the lands were swamp *709 and overflowed lands. Upon receipt of the certified selection list, the Secretary of Interior conveyed the lands to the State. Pierce v. Warren, 47 So.2d 857 (Fla.1950). Title to all sovereign lands and swamp and overflowed lands, upon receipt by the State of Florida, was vested in the Trustees of the Internal Improvement Fund. See Chapter 253, F.S.
“The Trustees did not have the power to convey sovereign lands prior to the enactment of Chapter 7304, Laws of Florida, Acts of 1917. Pierce v. Warren, supra. However, since 1917, the Trustees not only have had the power to convey submerged lands, but in fact, have conveyed hundreds of acres of submerged, sovereign lands to private individuals or corporations.
4. The Conveyance to Wakulla or its Predecessor in Title
“The United States caused the lands in this action to be surveyed and the coastline meandered in 1872. The United States survey platted the lands into government lots, and determined as a part of the plat, the acreage of each of those lots. Where a lot was bordered on one or more sides by water, the meander line of the coastline was used to determine the acreage of the lot. The lands involved in this action were conveyed either by patent from the United States to a private individual (Lot 6) or to the Trustees of the Internal Improvement Fund (Lots 1, 2, 3 and 4). The United States based the descriptions it used in its patents upon the plat of the original government survey, including the amount of acreage being conveyed. The State of Florida, in turn, used this same description, including the acreage, in its reconveyance of those lands.
“The Trustees of the Internal Improvement Fund conveyed all the lands involved in this action to either Wakulla or its immediate predecessor in title by tax deeds in 1943 and 1944. In both conveyances, the Trustees utilized the descriptions of the original plat of the United States survey and the acreages which were determined by utilization of the meanderline on that plat. Wakulla and its predecessor in title have paid the taxes imposed by the State of Florida since 1943 and 1944. These taxes were and are based upon the acreages shown on both the plat of the United States Government survey and the deeds of conveyance by the Trustee.
‘(4) No. Date Description
787 1927 Pt Gov Lot 1-3 Key 8467 1933 Largo, Deed Record
Book D4 Page 344.
Deed Record Book C2
Page 417. As re-
corded in Monroe
County Records.
“County of Monroe Deed # 469 from the State of Florida through the Trustees of the Internal Improvement Fund of the State of Florida to Silver Springs Ocala Co., Inc. as well as Corrective Deed # 469 from the Trustees to the Silver Springs Ocala Company (now Wakulla) contains the following language:
‘(3) KNOW ALL MEN BY THESE PRESENTS: That the State of Florida, through the Trustees of the Internal Improvement Fund of the State of Florida, under authority of Section 9 of Chapter 18296, Laws of Florida, Acts of 1937, for and in consideration of the amount of Seventeen Hundred Thirty-seven & 50/100 Dollars ($1737.50) to them in hand paid, the receipt of which is hereby acknowledged, has granted, bargained and sold, and by these presents does grant, bargain, sell and convey all of the right, title and interest of the State of Florida arising out of said Section 9 of Chapter 18296, unto the said GRANTEE, its successors and assigns, in and to the following described land, situate, lying and being in the County of Monroe, State of Florida, as referred to, identified and described by the State and County tax sale certificates to-wit: (Emphasis added)
Sec. Tp. Rg. Ac. Amount Rec’d
5 62 39 15 $ 187.50

*710

‘RESERVING unto the State of Florida easement for State Road Right of Way Two Hundred (200) feet wide, lying equally on each side of the center line of any State Road existing on the date of this deed through so much of any parcel herein described as is within One Hundred (100) feet of said center line.
‘(5) TO HAVE AND TO HOLD the above granted and described premises unto the said GRANTEE, and its successors and assigns forever, all in pursuance of Section 9 of Chapter 18296 aforesaid.’
The identical form of deed was used to convey Lot 6 to Wakulla’s predecessor in title. The language used by the Trustees clearly conveys all of the State’s interest in the lands, except for the reservation of a possible right-of-way. The language used in the deed from the Trustees to Wakulla could have conveyed both uplands and submerged lands. When lands are conveyed according to the plat of the original United States survey, the notes, lines, landmarks and other particulars become as much a part of the patent or deed as if they were set forth in it. South Florida Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672 (1922). Ordinarily, a meander line is not a boundary line; however, a meander line may constitute a boundary line where so intended. Lord v. Curry, 71 Fla. 68, 71 So. 21 (1916) and Lopez v. Smith, 109 So.2d 176 (Fla. 2nd D.C.A. 1959).
“The Trustees intended to convey a specific amount of acreage and in spite of the fact that the meander line must be considered a boundary line to obtain that amount of acreage, the Court does not hold that the parties to the tax deed in question intended the meander line to be a boundary line.
5. Navigability
“Wakulla contended that Rock Harbor inlet and Rock Harbor basin are not navigable. It should be noted that Wakulla does not assert its ownership of the lands under those non-navigable waters, but it contends that the rule as to the mean high water line does not apply to its adjacent coastline because those waters are non-navigable. In Florida, waters are not considered navigable merely because they are affected by the rise and fall of the tides. Lopez v. Smith, 109 So.2d 176 (Fla. 2nd D.C.A. 1959) and City of Tarpon Springs v. Smith, 81 Fla. 479, 88 So. 613 (1921), and if it is determined that the waters adjacent to a shoreline are not navigable, the State does not hold title to the shoreline below the mean high water line. City of Tarpon Springs v. Smith, supra.
“Navigability is dependent upon an application of existing law to the particular facts of each case. Broward v. Mabry, 58 Fla. 398, 50 So. 826 (1909), Clement v. Watson, 63 Fla. 109, 48 [58] So. 25 (1912). Rock Harbor inlet and basin are both very shallow. The National Ocean Survey charts show that, except where a channel has been dredged for access to a subdivision on Rock *711 Harbor inlet, the depths of that body of water (where they can be measured) are between one-half (V2) foot and one (1) foot. The basin is very shallow. Much of it is dry at low tide and the balance is so shallow that defendant’s representatives could not install its tide gauge except in a dredged canal. Finally, the evidence clearly shows that it was necessary to dredge channels across Rock Harbor inlet to the ocean in order to give the owners of boats in the subdivision on Rock Harbor inlet access to the sea.
“The Court finds that although the waters in both Rock Harbor inlet and basin are subject to the rise and fall of the tide, both bodies of water are non-navigable. The depths of both the inlet and the basin are so shallow that, unless dredged, they not only are inaccessible for commercial purposes, but also inaccessible to small, shallow-draft pleasure boats. In Florida, the subsequent dredging of a navigable channel across a non-navigable body of water does not render that body of water navigable. Clement v. Watson, supra.
6. Tidal Study and Surveys
“The Trustees made a tidal study to determine that the elevations of mean high water on Wakulla’s lands could be located and a survey to show the location of points that were at that mean high water line. The Trustees’ tidal study was performed by personnel of the State of Florida, the United States National Ocean Survey and a private contract firm. The method used was a short term method with an inherent error of ± .1 feet to ± .25 feet. John Michel, Wakulla’s expert witness, testified that when the rule of probabilities is applied to these results, including the inherent error, there is a probability of a still greater error. The evidence also showed that the inherent error resulting from the Trustees’ use of this short term method could result in an error in excess of 1,000 feet in the location of the boundary line.
“The Trustees did not locate a mean high water line, but only attempted to show that mean high water could be located. The surveys made by the Trustees purport to show the location on the ground of points of mean high water, the internal lot lines of the government lots and the original United States meander line. The Trustees offered into evidence two surveys, both made and certified by the same surveyor and both purporting to show points at mean high water. Although the Trustees’ surveyor certified that both surveys were accurate, they were in fact different and inconsistent as to the location of the points of mean high water.
“Secondly, the original lot lines and me-anderline were not properly located on the Trustees’ survey. The Trustees did not attempt to retrace the original government survey. Instead of attempting to relocate the lost or obliterated section and/or township corners, the Trustees used a section corner based upon the Model Land Company survey which, in turn, was based upon the right-of-way of the Florida East Coast Railway. These surveys were established over thirty years after the original survey.
“Wakulla did not make a tidal study. Its expert witness testified that it would require 18.6 to 19 years to obtain a sufficiently accurate elevation of mean high water to accurately locate a boundary line on these lands. The Trustees expert witnesses confirmed that a true, accurate determination of the mean high water line would require 18.6 to 19 years. See U. S. v. California, 382 U.S. 448, 15 L.Ed.2d 517, 86 S.Ct. 607 (1966); Borax Consolidated v. City of Los Angeles, 296 U.S. 10, 80 [L.]Ed. 9, 56 S.Ct. 23 (1935); U. S. v. Ray, 423 F.2d 16 (5th Cir. 1970). Wakulla had a survey made which was a retracement of the original government survey of these lands; then superimposed that survey upon a scaled aerial photograph.
“Wakulla’s surveyor restored the lost or obliterated northeast corner of Section 5, Township 62 South, Range 39 East, monu-mented that corner, then used that point of reference to retrace the interior lot lines and the original government meanderline. When Wakulla’s retracement survey is superimposed upon a scaled aerial photo *712 graph, the meanderline follows the actual coastline very closely. In addition, the evidence showed that if the plat of the government survey is used to determine Wakulla’s boundaries, there would be no encroachment by Wakulla on the privately owned adjacent lands.
“A comparison of the surveys in evidence shows that the Trustees’ surveys are in conflict, each with the other, and that the interior lot lines and meander line of both of the Trustees surveys are substantially offset from the retracement made by Wa-kulla’s surveyor. Wakulla’s retracement controls as to the location of the section corners, interior lot lines and the meander-line, because original actual surveys of public lands by the United States government, on the faith of which property rights have been acquired, control over surveys subsequently made. Kelsey v. Lake Childs Co., 93 Fla. 743, 112 So. 887 (1927).
“The Trustees did not obtain a mean high water line. The Trustees determined points along the coastline which purportedly are at mean high water. The Board of Trustees contends that it does not have to establish a mean high water line, but only show that a mean high water line can be established. This theory seems contrary to the decisions of the Florida Supreme Court in Trustees v. Wetstone, 222 So.2d 10 (Fla.1969); Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927); and Hardee v. Horton, 90 Fla. 452, 108 So. 189 (1925). The inconsistencies in the surveys placed into evidence by the Trustees’ surveyor creates doubts that the Trustees, in fact, accurately located points which are at mean high water. In any event, the Court cannot rely on either of the Trustees’ surveys in its determination to locate the boundary line which separates Wakulla’s lands from the Trustees’ lands, in that no mean high water line was located on those surveys.
7. Location of the Boundary Line
“The Court after reviewing the evidence and testimony presented at the final hearing finds that Rock Harbor inlet and basin are not navigable. Thus, the meanderline of the original United States survey is the boundary line separating Wakulla’s lands in Government Lots 1, 2, 4 and 6 where the shores of those lots border Rock Harbor inlet and basin. Title to the submerged lands lying beneath Rock Harbor inlet and basin is in the Trustees. Lord v. Curry, 71 Fla. 68; 71 So. 21 (1916) and South Florida Farms Co. v. Goodno, 84 Fla. 532; 94 So. 672 (1922).
“The boundaries of Wakulla’s lands in Government Lots 3 and 4 which border the Atlantic Ocean is more difficult to determine. In the location of a boundary line, natural monuments prevail over courses and distances and courses and distances prevail over quantity. Trustees of the Internal Improvement Fund v. Wetstone, supra, and Calder v. Hillsboro Land Company, 122 So.2d 445 (Fla. 2nd D.C.A. 1960). Where a patent to public lands refers to the plat of the original United States survey and that plat shows that the land is bounded by a permanent body of water, the water line, not meanderline is the boundary. South Florida Farms Co. v. Goodno, supra. The natural monument is the body of water (the Atlantic Ocean) or the mean high water line. Trustees of the Internal Improvement Fund v. Wetstone, supra. The Trustees either did not or could not locate this natural monument.
“The only courses and distances available are those of the meanderline. The quantity, the acreage referred to on the original plat, is available. Under the circumstances and in the absence of better evidence, the Court must rely on the quantity of land conveyed by the Trustees; thus the mean-derline of the original United States survey which was used to determine the quantity of land in Government Lots 3 and 4 is the only boundary line available to the Court. Horne v. Smith (Fla.) 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68 (1895); Trustees of the Internal Improvement Fund v. Wetstone, supra; and Lopez v. Smith, 145 So.2d 509 (Fla. 2nd D.C.A. 1962). For the foregoing reason, the Court finds that the meander-line on the original United States survey and plat of 1872 of Government Lots 3 and *713 4 is the boundary line separating the uplands owned by Wakulla and the submerged, sovereign lands below the Atlantic Ocean owned by the Trustees. It therefore is:
“ORDERED AND ADJUDGED as follows:
1. The boundary line separating the uplands owned by plaintiff in Government Lot 6, Section 32, Township 61 South, Range 39 East; the West lk of Government Lots 1 and 3 and all of Government Lots 2 and 4 in Section 5, Township 62 South, Range 39 East, from the adjacent submerged lands owned by the Trustees is the meanderline of the United States survey of 1872, subject, however, to any subsequent natural changes such as acretion, erosion or reliction.
2. The title of plaintiff Wakulla Silver Springs Company to the lands lying within the boundaries of Government Lot 6, Section 32, Township 61 South, Range 39 East and the West V2 of Government Lots 1 and 3 and all of Government Lots 2 and 4 in Section 5, Township 62 South, Range 35 East as described in the United States survey and plat of 1872 is good title against the Florida State Board of Trustees of the Internal Improvement Trust Fund and all persons claiming by, through, under or against said Board of Trustees; any such claims or purported claims hereby are can-celled and the title to the above-described property is forever quieted in plaintiff.
3. The costs of this action shall be taxed against defendants.”
We find neither any need to add to the foregoing decision and opinion of the trial judgment nor any reason to disturb it. Accordingly, the final judgment appealed is affirmed.
Affirmed.